**NOT FOR PUBLICATION**

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
| In Re:<br><br>Charles Eric Kern,<br><br>Debtor. | Case No.:  20-18381-ABA<br><br>Adv. No.:  20-1560-ABA |
| Parke Bank, Plaintiff<br><br> v.<br><br>Charles Eric Kern, Defendant. | Chapter:  12<br><br>Judge:  Andrew B. Altenburg, Jr. |

## MEMORANDUM DECISION

Before the court is the Motion for Summary Judgment filed by Parke Bank ("Parke") against the debtor/defendant, Charles Eric Kern ("Mr. Kern")  Doc. No. 11. Parke requests summary judgment as to its Counts I and III, seeking nondischargeability pursuant to section 523(a)(2)(A) and/or (a)(6) for post-loan fraud and conversion in connection with Parke's collateral. Mr. Kern denies the allegations. The court finds that Mr. Kern's denials do not create genuine issues of material fact requiring trial, and that Parke is entitled to judgment as a matter of law on both counts.

In addition, Mr. Kern filed a Motion for Partial Summary Judgment (Doc. No. 18) that is wholly unconnected from Parke's Amended Complaint. Accordingly, it will be denied without prejudice.

## JURISDICTION AND VENUE

This matter before the court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and the court has jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012, referring all bankruptcy cases to the bankruptcy court. The following constitutes this court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## PROCEDURAL HISTORY

Parke filed a three-count adversary complaint on October 8, 2020 and an amended complaint on October 27, 2020. Doc. Nos. 1, 4. Mr. Kern answered the amended complaint on November 9, 2020. Doc. No. 5. Mediation was unsuccessful. Doc. No. 10.

On June 10, 2021, Parke filed a Motion for Summary Judgment on Counts I and III. Doc. No. 11. Mr. Kern filed opposition on June 28, 2021. Doc. No. 14. Parke responded on July 1, 2021. Doc. No. 16.

Mr. Kern filed a Motion for Partial Summary Judgment on July 2, 2021 seeking a declaratory order regarding the balances due on the various loans and lines of credit granted to him by Parke. Doc. No. 18. Parke filed responses on July 13 and 19, 2021. Doc. Nos. 20, 22.

Following a hearing held August 3, 2021, the court took this matter under advisement. This matter is now ripe for disposition.

## SUMMARY OF ALLEGATIONS AND RESPONSE

Mr. Kern is a farmer who obtained loans and working capital from Parke. Thereafter, Parke alleges that Mr. Kern sold some of its equipment collateral and leased it back without Parke's consent. Mr. Kern hid this activity by lying to Parke representatives regarding the whereabouts of certain equipment and routing the proceeds of the sales through several bank accounts so that Parke would not identify the source of his loan payments. Parke alleges that this post-loan conduct constitutes fraud for purposes of section 523(a)(2)(A), and/or conversion, which constitutes willful and malicious injury for purposes of section 523(a)(6). Parke alleges that the injury to it consists of:

> (1) either the full value of the converted collateral, $350,643, or the difference between the amount Mr. Kern sold (and leased back) the collateral for and what that collateral sold for when Parke sold it during this bankruptcy case, which is $147,393 (i.e., the depreciation in the equipment);
> (2) the $69,000 in additional credit on the line of credit that it would not have extended had Mr. Kern not concealed his activities and converted Parke's collateral;
> (3) $54,000 or more in legal fees and costs; and
> (4) any amounts paid to other secured creditors in settlement.

Doc. No. 11-1, p. 29, ¶ 188.

Mr. Kern responded that Parke alleged no facts supporting a finding of fraudulent intent at the time the loan was made. However, Mr. Kern misunderstands Parke's argument: it did not allege that Mr. Kern committed fraud when he entered into the loans, it argued that he committed fraud in 2018 when he fraudulently converted Parke's collateral. As to the willful and malicious count, Mr. Kern stated that there is no evidence that his actions were meant to cause willful and malicious injury to Parke: Parke received the proceeds from the transactions and later received additional

funds from three of the four entities to which Mr. Kern had sold and leased back Parke's collateral. In addition, Mr. Kern questioned whether Parke had a valid perfected security interest in the items sold, particularly as concerns the collateral sold to Blue Bridge, the fourth entity with which Mr. Kern granted a security interest on Parke's collateral.

## UNDISPUTED FACTS

The following are the facts alleged by Parke and admitted to by Mr. Kern, except as otherwise noted.

Parke holds a money judgment against Mr. Kern, jointly and severally with his wife, Tara L. Kern ("T. Kern") and CEK Farms, LLC ("CEK") in the amount of $3,261,900 ("Money Judgment"). Doc. Nos. 11-1 and 14-2, ¶ 1. The Money Judgment is based upon multiple defaulted loans executed in January 2017 by the Kerns:

    a. A term loan in the amount of $701,000 ("701K Loan").
    b. A term loan in the amount of $500,000 ("500K Loan").
    c. A term loan in the amount of $1.399 million ("1.399 Loan").
    d. A commercial line of credit in the amount of $500,000 ("Line of Credit").

*Id.*, ¶ 2 (collectively, the "Loan Portfolio").

All three loans were secured by mortgages (collectively "Mortgages") on certain real property parcels that were recorded. *Id.*, ¶¶ 3, 4. The $1.399 Loan was guaranteed by the United States Department of Agriculture ("USDA Guaranty"). *Id.*, ¶ 5. Pursuant to the USDA Guaranty, Parke, as the lender, may not pay down the unguaranteed portion of the loan first. *Id.*, ¶ 6.

Mr. Kern also executed an Assignment of Leases, Rents and Other Agreements, granting to Parke an absolute assignment of all leases, security deposits, books and records, and any other agreements related to the lease of the real properties. *Id.*, ¶ 7. The mortgages and the assignment of rents were released, as the real properties have all been sold, and Parke no longer holds liens on any of the Kern's real estate. *Id.*, ¶ 8.

The Loan Portfolio was evidenced by certain promissory notes executed by Mr. Kern and his wife for each loan ("Notes"). *Id.*, ¶ 9. The Loan Portfolio was also secured by a lien on all assets of Mr. Kern, including machinery, equipment, inventory, accounts, money, and other business assets, as evidenced by the separate security agreements executed in connection with each loan ("Security Agreements"). *Id.*, ¶ 10. The Security Agreements each granted Parke a security interest in, among other things, equipment, "excluding CLAAS Combine and Case IH 225." *Id.*, ¶ 11.

The security interest in all assets was also set forth at length in the Commercial Security Agreement applicable to the entire Loan Portfolio, also executed by the Kerns on January 13, 2017 ("Blanket Security Agreement"). *Id.*, ¶ 12. The Blanket Security Agreement, signed by the Kerns, provides, unequivocally, that the Kerns "shall not sell, offer to sell, or otherwise transfer or dispose

of" Parke's collateral." *Id.*, ¶ 13. The Blanket Security Agreement further provides that the Kerns "shall not pledge, mortgage, encumber or otherwise permit" Parke's collateral "to be subject to any lien, security interest, encumbrance, or charge" other than Parke's lien. *Id.*, ¶ 14. The Blanket Security Agreement grants Parke a security interest in "the following described property of Debtor … whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, together with all Proceeds thereof and all insurance proceeds pertaining thereto: Accessions, Accounts, Deposit Accounts, Inventory, Equipment excluding CLAAS Combine and Case IH 225, Fixtures, Books and Records, Chattel Paper, Documents, Farm Products, Goods, General Intangibles, Instruments, Investment Property, Money, Payment Intangibles, Promissory Notes, Securities, Software and Supporting Obligations." *Id.*, ¶ 15.

To perfect its lien on personal property, Parke filed a UCC-1 Financing Statement on January 20, 2017 ("UCC"). *Id.*, ¶ 16. The UCC describes the collateral as follows: "All of the Debtor's now owned or hereafter acquired personal property, including all 'Accessions', 'Accounts', 'Deposit Accounts', 'Inventory', 'Equipment', 'Fixtures', 'Books and Records', 'Chattel Paper', 'Documents', 'General Intangibles', 'Instruments', 'Investment Property', 'Money', 'Payment Intangibles', 'Promissory Notes', 'Securities', 'Software' and 'Supporting Obligations' as defined in the New Jersey Uniform Commercial Code… including all cash and non-cash proceeds thereof." *Id.*, ¶ 17.

Mr. Kern pointed out that the UCC does not include "machinery." Doc. No. 14-2, ¶ 17. But he admitted that during the underwriting stage of the Loan Portfolio, on October 25, 2016, Parke obtained a desktop appraisal of all equipment he  owned based upon a list provided by him ("Desktop Appraisal"). Doc. Nos. 11-1 and 14-2, ¶ 18. The Desktop Appraisal listed 65 pieces of equipment, including 13 items pertinent to Parke's adversary proceeding. *Id.*, ¶ 19. Thus, there is no genuine issue of material fact that Mr. Kern knew that Parke's Security Agreement covered his machinery. Whether the UCC reflected, and the court makes no statement either way, that does not change Mr. Kern granted a security interest in that machinery, and that the Blanket Security Agreement prohibited him from disposing or encumbering the machinery.

Parke alleged that the total appraised fair market value of the Equipment as of October 2016 was $411,458. Doc. No. 11-1, ¶ 20.[1]

Mr. Kern's payments under the Loan Portfolio were due annually on February 1 of each year, beginning February 1, 2018. *Id.*, ¶ 21. These payments, including principal and interest, were as follows:

| | |
|---|---|
| 701K Loan | $71,594 |
| 500K Loan | 53,600 |
| $1.399 Loan | 142,882 |

*Id.*, ¶¶ 22-24; *see* Doc. No. 11-10, ex. I. The Line of Credit matured on February 1, 2018; the interest due for 2018 was $30,880. *Id.*, ¶ 25.

---

[1] Mr. Kern denied this, stating that he does not know where this valuation came from. Doc. No. 14-2, ¶ 20. Parke cited to an affidavit of Mr. Talarico stating he calculated this amount based on an Appraisal Report. *See* Doc. No. 11-9, Mr. Talarico Affidavit, ¶ 16; ex. H, p. 3. It is not clear to the court how he came to this figure.

Mr. Kern made the following payments on the following dates, leaving $97,882.58 remaining due for on the 1.399 Loan:

| | | |
|---|---|---|
| 701K Loan | $71,594 | February 15, 2018 |
| 500K Loan | 53,600 | February 20, 2018 |
| 1.399 Loan | 45,000 | March 1, 2018 |

*Id.*, ¶¶ 26-28.

Because Mr. Kern failed to make full payments on the 1.399 Loan and none on the Line of Credit, a meeting was held at Parke on March 6, 2018, to discuss the default ("Loan Meeting"). (Mr. Kern states that the meeting was held on March 7—the date is not material.) Doc. Nos. 11-1 and 14-2, ¶ 29. Present at the Loan Meeting were the Kerns as well as James S. Talarico, Vice President at Parke; Vito S. Pantilione, President of Parke; Ralph Gallo, Senior Vice President of Parke; and Yogendrakumar Shukla, Vice President at Pake. *Id.*, ¶ 30.

The day after the Loan Meeting, Mr. Talarico prepared a memorandum summarizing the Loan Meeting and the discussions held therein. *Id.*, ¶ 31. According to that memo, at the Loan Meeting Mr. Kern represented that he expected to receive $100,000 "within the next few days" as payment for prior work he performed. Doc. No. 11-1, ¶ 32; Doc. No. 11-11, ex. J. Mr. Kern admitted that he said he expected $100,000 within the next few days but not that he said that it was for prior work. Doc. No. 14-2, ¶ 32. The court finds material that Mr. Kern did not tell Parke that the $100,000 was coming from a sale of Parke's collateral.

Mr. Kern made his remaining loan payments after the Loan Meeting. Doc. Nos. 11-2 and 14-2, ¶ 33. Specifically, on March 12, 2018, Debtor paid $12,000 on the Line of Credit, and he paid an additional $18,880 on the Line of Credit on March 19, 2018, for total payments of $30,880, i,e, the interest due. *Id.*, ¶ 34. Also on March 12, 2018, Mr. Kern paid the remaining balance due for the 1.399 Loan installment. *Id.*, ¶ 35.[2]

Mr. Kern could not pay the Line of Credit in full by the Feb. 1, 2018 maturity date and sought a modification to extend the date by one year and to allow him to draw on the line of credit. *Id.*, ¶ 38. In April 2018, after Mr. Kern made the annual loan payments, the Kerns and Parke entered into a modification agreement with respect to the Line of Credit to extend the maturity date to February 1, 2019 ("LOC Modification"). *Id.*, ¶ 39. Under the LOC Modification, Mr. Kern drew an additional $69,000 on the Line of Credit. *Id.*, ¶ 40. Parke agreed to the LOC Modification because Mr. Kern had made his loan payments. *Id.*, ¶ 41. Parke also agreed to the LOC Modification on the basis that CEK Farms LLC would be providing its absolute and unconditional guaranty of the amounts due under the Line of Credit. *Id.*, ¶ 42.

In December 2016, prior to executing the loan documents but after the underwriting process was complete, Mr. Kern formed CEK Farms, LLC, a limited liability company ("CEK"). *Id.*, ¶ 36. Parke alleges it did not learn of the existence of CEK until Mr. Kern presented CEK as a guarantor for the purposes of obtaining the LOC Modification. Mr. Kern admitted that CEK

---

[2] That is, $97,882 plus $30,880, equaling $128,762.

guaranteed the LOC Modification, but denied knowledge of when Parke learned of the existence of CEK, *id.*, ¶ 43, thus admitting that he did not advise them.

Mr. Kern did not make any payments on the Loan Portfolio when due in 2019. *Id.*, ¶ 44. He attended another loan meeting at Parke in the spring of 2019, but he was unable to cure the default thereafter, and Parke made a business decision to accelerate the Loan Portfolio and pursue the Kerns and CEK for the debt. *Id.*, ¶ 45.

Parke commenced an action in the Gloucester County Superior Court, Law Division, on April 24, 2019, Docket No. L-000527-19, to recover the Money Judgment ("Law Division Action"). *Id.*, ¶ 49. Parke also commenced a foreclosure action in the Salem County Superior Court, Chancery Division, on May 15, 2019, Docket No. F-009127-19 ("Foreclosure Action"). *Id.*, ¶ 50. Both the Law Division Action and the Foreclosure Action were marked by litigation, including the appointment of a fiscal agent. *Id.*, ¶ 51. On February 6, 2020, the Superior Court entered a final judgment in foreclosure in the amount of $3,236,900, by consent, including taxed costs ("Foreclosure Judgment"). *Id.*, ¶ 52. The Law Division entered a Money Judgment on March 27, 2020, in an amount based upon the Foreclosure Judgment. *Id.*, ¶ 53.

Post-judgment, Mr. Kern failed to comply with two separate court orders requiring turnover of rental income to a fiscal agent, and Parke filed a motion for contempt, returnable July 10, 2020, due to this failure, among other things. Doc. No. 11-1, ¶ 54. Mr. Kern denied this, averring that Parke's fiscal agent was to collect the rents directly; Mr. Kern just turned over any rents that were paid to him. Doc. No. 14-2, ¶ 54. But Mr. Kern admitted in his Rule 2004 examination that he collected rent from his tenants every month since the appointment of the fiscal agent, agreed that the fiscal agent's records showed he did not receive rents from him in January, February, March, May or July of 2020, and testified that "They weren't turned in." *See* Doc. No. 11-1, ex. M (2004 Exam Transcript), at 49:17-24

**The Central Jersey Equipment ("CJE") Transaction**

Mr. Kern owned 1999 Deere [sic] and a Deere Planter.[3] Doc. Nos. 11-1 and 14-2, ¶ 57. He engaged in the following transaction.



---

[3] The purchase order referenced by Parke lists a 2008 John Deere 1770NT-12R30 WMEXP and a 1997 John Deere 9300 360HP Tractor Reg II, being sold for $50,000 each. Doc. No. 11-15, ex. N, p. 2. In the Desktop Appraisal dated October 25, 2016, the 2008 piece of equipment (a planter) is listed as being a 2009; the 1997 tractor is listed as a 1999. Doc. No. 11-9, ex. H, pp. 25-25. Mr. Kern did not object to these being the pieces of equipment in the referenced transactions.

*See* Doc. No. 11-1, ¶¶ 57-77; Doc. No. 11-15, ex. N; Doc. No. 11-16, ex. O; Doc. No. 11-17, ex. P.

On March 23, 2018, Parke representatives inspected Mr. Kern's farm and equipment; Parke alleged that Mr. Kern told them that Deer the Planter was sold prior to the loan closing (i/e not included in Parke's collateral). Doc. Nos. 11-1 and 14-2, ¶¶ 62-64. In May 2019, the equipment was repossessed by CJE for non-payment. *Id.*, ¶ 66. In June 2019, Parke representatives inspected Mr. Kern's farm and equipment. *Id.*, ¶ 69. Mr. Kern represented to them that the equipment was at CJE for repair. *Id.*, ¶ 70.  All three went to CJE to inspect the equipment. *Id.*, ¶ 71. Mr. Kern did not tell Mr. Talarico that the equipment had been repossessed. *Id.*, ¶ 72. Parke alleged that it discovered Mr. Kern that Mr. Kern had sold the CJE equipment when it received an Article 9 sale notice from John Deere Financial in July 2019. Doc. No. 11-1, ¶ 74.

**Blue Bridge**

Mr. Kern owned a Spray Coupe, the Air Seeder, and the Deere Cart. Doc. No. 11-1, ¶ 81. Regarding this equipment, the following transactions took place:



*See* Doc. Nos. 11-1 and 14-2, ¶¶ 78-85; Doc. No. 11-1; Doc. No. 11-9, ex. H; Doc. No. 11-23, ex. V; Doc. No. 11-24, ex. W.

**Financial Pacific Leasing**

Mr. Kerns owned a Case Backhoe, the 1980 Deere, and the Deere Combine. Doc. No. 11-1, ¶ 91.
In April 2018, he engaged in the following transactions:



*See* Doc. Nos. 11-1 and 14-2, ¶¶ 88-95; Doc. No. 11-27, ex. Z.

**GFRS Equipment Leasing Fund II, LLC**

On July 24, 2018, Mr. Kern leased an irrigation system for his farm from GFRS, giving as
collateral a lien on Parke's collateral: a Deere Corn Head, Case Planter, Deere Planter, Walinga
Grain Vac, and Dalton Sprayer. Doc. No. 11-1, ¶ 99. Mr. Kern denied this only as to whether the
collateral was given by him or by CEK Farms. Doc. No. 14-2, ¶ 99.[4]

The Dalton Sprayer was later sold to George Cassaday for $5,000; the remaining GFRS
Equipment was sold at auction for $37,000, for a total of $42,000, which is $2,143 less than the
GFRS Equipment was worth when Mr. Kern converted it. Doc. No. 11-1, ¶ 186.

**Damages related to conversion of the property**

As of February 1, 2018, Mr. Kern had a bank account at Parke ("Parke Account") and a
personal bank account for his farm at Century Savings Bank ("Kern Account"). Doc. Nos. 11-1

---

[4] Parke alleged that the GFRS contract documents are executed by CEK as a representation that CEK was providing
the GFRS Equipment as additional collateral, thus representing to GFRS that the GFRS Equipment belonged to CEK,
even though the equipment was owned by Mr. Kern. Doc. Nos. 11-1 and 14-2, ¶ 100. A
document titled Rewrite Amendment to Lease Agreement notes the lessee and the lessor, and then lists the additional
collateral Doc. No. 11-29, p. 9. The agreement is signed by Mr. Kern for CEK Farms and by him as an
"acknowledgment of guarantor." *Id.* Thus, the logical inference is that the lessee was providing the additional
collateral.

and 14-2, ¶¶ 114, 115. Also as of February 1, 2018, CEK had a bank account at Century Savings Bank ("CEK Account). Doc. Nos. 11-1 and 14-2, ¶ 116.

In its motion, in excruciating detail, Parke traced the deposits into and withdrawals from these accounts to support its contention that Mr. Kern purposely deposited checks in connection with the alleged fraudulent transfers into the CEK account and then moved the funds into either the Kern Account or the Parke Account, so that Parke would not be alerted to the transfers of equipment. Mr. Kern admitted to all of the deposits and withdrawals. *See* Doc. Nos. 11-1 and 14-2, ¶¶ 114-155.

Parke further alleged that "[t]he Converted Proceeds were intermingled with other deposits in Mr. Kern's personal and business accounts and used for multiple purposes, including credit card payments, loan payments, farm expenses and personal expenses," which Mr. Kern only denied to the extent that the proceeds were converted. *Id.*, ¶ 153.

Parke further alleged that Mr. Kern did not make his required payments and then pay Parke the Converted Proceeds, which were Parke's property. Doc. No. 11-1, ¶ 154. Mr. Kern denied this allegation, stating that he did make his required payments. Doc. No. 14-2, ¶ 154. The court agrees with Parke that this denial misconstrues the allegation: Mr. Kern did not make his required payments <u>and</u> pay Parke the Converted Proceeds, meaning he did not pay extra. Doc. No. 16, p. 4.

Parke alleged that Mr. Kern made his contractual annual payments to Parke in 2018 and used the Converted Proceeds for his own purposes while concealing his activities from Parke. Doc. Nos. 11-1 and 14-2, ¶ 155. Mr. Kern denied this, stating that he made his contractual annual payments to Parke in 2018 from the proceeds from the sale of assets; he did not knowingly conceal any of his activities from Parke. Doc. No. 14-2, ¶ 155.

**The bankruptcy case**

Mr. Kern has operated his family farm since 1994, including "borrowing all the money and paying the bills." Doc. Nos. 11-1 and 14-2, ¶ 47. He has a bachelor's degree in management. *Id.*, ¶ 46.

Mr. Kern filed the Chapter 12 bankruptcy case on July 9, 2020. Doc. Nos. 11-1 and 14-2, ¶ 55. He filed his schedules on July 31, 2020. *Id.*, ¶ 156. His Schedule D lists 11 secured creditors with debts exceeding $3.9 million. *Id.*, ¶ 157. His Schedule F lists 32 unsecured creditors with debts of nearly $1.5 million. *Id.*, ¶ 158. Mr. Kern marked 41 out of 43 of his scheduled debts as "disputed." *Id.*, ¶ 159. Mr. Kern indicated on his schedules that Parke's collateral (as set forth on a list attached to the schedules), was his individual property. *Id.*, ¶ 160.

On August 7, 2020, Parke filed a Motion for Relief from Stay in the underlying bankruptcy case ("Motion for Relief"). Doc. Nos. 11-1 and 14-2, ¶ 161. On September 8, 2020, Mr. Kern filed a Certification in Opposition to the Motion for Relief ("Certification"). *Id.*, ¶ 162. In the Certification, Mr. Kern certified, under penalty, that he had "not sold, transferred or otherwise disposed of any equipment that secures Parke's claim." Doc. Nos. 11-1 and 14-2, ¶ 163. Attached

to the Certification was a list of all Mr. Kern's current equipment, upon which his handwritten notes and the Certification itself indicated that the FPL Equipment was subject to FPL's first lien; that the Blue Bridge Equipment was subject to Blue Bridge's first lien; and the CJE Equipment was a "repo." Doc. Nos. 11-1 and 14-2, ¶ 164. Only the Deere Planter and the Deere Corn Head were listed as subject to a lien by GFRS; the remaining GFRS Equipment was marked "Parke." *Id.*, ¶ 165.

Parke conducted a Rule 2004 Examination of Mr. Kern on October 1, 2020 ("2004 Exam"). *Id.*, ¶ 56. When questioned about the Certification, Debtor confirmed that it was inaccurate and attempted to circumvent the misrepresentation. *Id.*, ¶ 166. In contrast, in his Answers to Parke's Request for Admissions, Mr. Kern indicated that Blue Bridge, Deere, CJE, CC, GFRS and FPL were all "reputable large companies," and they did not tell him he could not sell or transfer the equipment; he said nothing about timing or misunderstanding the Certification. *Id.*, ¶ 167.

**Current balances due; damages**

Parke's Proof of Claim, Claim No. 21, sets forth a balance due as of the petition date on the Money Judgment, including post-judgment interest, of $3,303,723.96 ("Claim"). *Id.*, ¶ 169. Since the filing of the Claim, Parke applied credits as follows:

| | |
|---|---|
| Claim | $3,303,723.96 |
| Liquidated Deposit Account | ($25,008.50) |
| Sale of Real Properties | ($2,336,427.53) |
| Funds from Fiscal Agent | ($621.00) |
| Equipment Sale Proceeds (after costs of sale) | ($181,972.50) |
| Collection of Rents | ($10,460.00) |
| **Remaining Claim** | **$749,234.88** |

Doc. No. 11-1, ¶ 170. Parke filed an Amended Claim reflecting the current deficiency balance of $749,234.88. *Id.*, ¶ 171.

The USDA commitment for the loans required that the USDA loan be in second position on the real properties, behind only the 701K Loan. *Id.*, ¶ 172. Parke alleged that it internally applied the proceeds from the sale of the real properties to the 701K Loan first, and then to the 1.399 Loan, as required by the USDA; the proceeds were then applied to the remaining two loans. Doc. No. 11-1, ¶ 173. It stated that because the USDA-guaranteed loan was paid from the proceeds of the sale of the real properties, Parke would not be receiving any payment on the USDA Guaranty. Doc. No. 11-1, ¶ 174.

As of the filing of the complaint, the Blue Bridge Equipment was still in dispute; the parties had agreed to sell the Blue Bridge Equipment and escrow the proceeds pending the outcome. Doc. Nos. 11-1 and 14-2, ¶ 175.

Parke alleged that it has incurred counsel fees and legal costs in connection with Mr. Kern's conduct described herein exceeding $54,000 as of May 31, 2021, related to this nondischargeability action, litigation with other creditors, and the motion to convert; costs continue to accrue. Doc. No. 11-1, ¶ 176.[5]

Parke alleged that it extended an additional $69,000 in credit to Mr. Kern that it would not have extended had Mr. Kern not concealed his activities and converted Parke's collateral. Doc. No. 11-1, ¶ 177. Mr. Kern denies this, stating that Parke extended additional monies because the he paid his 2018 obligation on account of the four loans. Doc. No. 14-2, p. 16, ¶ 177. The court finds that this is just another side of the same coin: Mr. Talarico, testifying under oath on behalf of Parke, indicated that Parke would not have extended the Line of Credit had Mr. Kern not paid the loan payments and had Mr. Kern not concealed his activities. Doc. No. 16, p. 4.

Mr. Kern received $306,900 from CC and CJE for the CJE Equipment ($100,000), the Blue Bridge Equipment ($100,000), and the FPL Equipment ($106,900), as set forth above. Doc. No. 11-1, ¶ 178.[6]

Parke estimated the GFRS Equipment that Mr. Kern induced GFRS to encumber was worth $44,143 in 2018, therefore, the total value of the equipment, including the GFRS Equipment, was $350,643. Doc. No. 11-1, ¶¶ 179, 180. Mr. Kern denied this, arguing only that the value of the GFRS equipment had not been fixed by any court, but not proposing any other value. Doc. No. 14-2, ¶ 179.

Parke alleges that although it eventually sold the CJE Equipment, the total sale price was $63,000, which is $37,000 less than Mr. Kern received when he converted the CJE Equipment. Doc. No. 11-1, ¶. 181. Mr. Kern stated that he has no knowledge of his own concerning what Parke eventually sold the CJE equipment for. Doc. No. 14-2, ¶ 181. He averred that if the total price of the sale of the CJE equipment was $63,000 and Parke retained that amount because CJE conceded that Parke was in first position, this means that from the sale of the CJE equipment, Parke received $80,000 from Mr. Kern plus an additional $63,000 from the sale of the CJE equipment. *Id.* Parke responded that Mr. Kern's denial mischaracterizes the transaction. "Debtor paid his regular loan payments to Parke. Debtor received $80,000 cash and $20,000 towards a down payment in the CJE Transaction. Parke received, before costs of sale, $63,000 for the CJE Equipment at auction, which is $37,000 less than what Debtor received for it when he surreptitiously sold it without Parke's knowledge or consent." Doc. No. 16, p. 4.

Parke alleged that although it eventually sold the FPL Equipment, the total sale price was $59,750, which is $47,150 less than the $106,900 Mr. Kern received when he converted the FPL Equipment. Doc. No. 11-1, ¶ 182. Mr. Kern denied this, stating that if Parke eventually sold the

---

[5] Mr. Kern's denial of this allegation, Doc. No. 14-2, ¶ 176, confuses attorneys' fees incurred in connection with the state court actions with this nondischargeability action.

[6] Mr. Kern agreed regarding Blue Bridge and FPL but stated that only $80,000 was received from the CJE equipment sale and the remaining $20,000 was transferred to John Deere as part of the finance transaction. Doc. No. 14-2, ¶ 178. Parke responded that this denial is also unsupported. "Debtor is attempting to argue that the $100,000 from CJE was only $80,000 because $20,000 was applied as a down payment. CJE paid $100,000 for the equipment and Debtor used $80,000 as cash and $20,000 as a down payment." Doc. No. 16, p. 4.

FPL equipment for $59,750 and received those funds, then Parke received $106,900 from him plus an additional $59,750 from the ultimate sale of the FPL equipment. Doc. No. 14-2, ¶ 182. Parke responded that Mr. Kern's denial again mischaracterizes the transaction. "Debtor paid his regular loan payments to Parke. Debtor received $106,900 in the FPL Transaction. Parke received, before costs of sale, $59,750 for the FPL Equipment at auction, which is $47,150 less than what Debtor received for it when he surreptitiously sold it without Parke's knowledge or consent." Doc. No. 16, p. 5.

The Spray Coupe sold for $38,500, which is $61,500 less than the $100,000 Mr. Kern received when he converted the Blue Bridge Equipment. Doc. No. 11-1, ¶ 183. Mr. Kern denied converting the equipment, and stated that it appeared that at least $38,500 was still in dispute between Blue Bridge and Parke. Doc. No. 14-2, ¶ 183. Parke alleged that the other two pieces of Blue Bridge Equipment did not sell, as the reserve of $2,500 each was not met. Doc. No. 11-1, ¶ 184. Mr. Kern denied this and further stated that there may be two other pieces of Blue Bridge equipment that are in dispute and may be turned over to Parke. Doc. No. 14-2, ¶ 184. The net proceeds for the Spray Coupe are being held in escrow pending resolution of the litigation. Doc. Nos. 11-1 and 14-2, ¶ 185.

The Dalton Sprayer was sold to George Cassaday for $5,000; the remaining GFRS Equipment was sold at auction for $37,000, for a total of $42,000, which is $2,143 less than the GFRS Equipment was worth when Mr. Kern converted it. Doc. No. 11-1, ¶ 186. Mr. Kern stated that he had no knowledge of the transaction between Mr. Cassaday and GFRS regarding the Dalton sprayer and further had no knowledge of how much the remaining GFRS equipment sold for at auction. Doc. No. 14-2, ¶ 186. He stated that Parke stated that the dispute between Parke and GFRS was resolved under confidential terms and that Parke sold the GFRS equipment. *Id.* Mr. Kern alleges that it should be noted that with respect to the GFRS transaction between him, CC Heavy Equipment and GFRS, there was no sale by him of any equipment, but that he gave additional collateral to GFRS of equipment owned by him, which Parke now says produced $42,000 at auction. *Id.* Parke responded that Mr. Kern's denial "contains argument and legal conclusions that must be disregarded."

Parke alleged that the total difference between the value Mr. Kern received for the equipment ($350,643) and the gross proceeds from the 2021 sale of the equipment ($203,250) is $147,393. Doc. No. 11-1, ¶ 187. Mr. Kern denied this, alleging that it cannot be determined where Parke got these numbers, Doc. No. 14-2, p. 17, ¶ 187, but Parke just set forth how it arrived at these figures.

Based upon the foregoing, Parke alleged that its damages flowing from Mr. Kern s conduct as of May 31, 2021 totalled anywhere from $270,393 to $473,643, plus counsel fees and legal costs continuing to accrue and litigation ongoing, as follows:

    a. $54,000 or more in legal fees and costs.
    b. $69,000 extended on the line of credit.
    c. $147,393 – $350,643 for the converted equipment.
    d. Any amounts paid to other secured creditors in settlement.

Doc. No. 11-1, ¶ 188. Mr. Kern denied this, asserting that the debt due Parke is dischargeable and has not been a violation of any of the sections of the Code plead in Parke's Complaint. Doc. No. 14-2, ¶ 188.

### A. Additional material facts

As will be explained below, in considering a summary judgment motion, the court can consider the pleadings, depositions, answers to interrogatories, and any other evidence admissible at trial. Accordingly, in addition to what Parke alleged regarding the Commercial Security Agreement, and Mr. Kern admitted, above, the court adds that the Commercial Security Agreement was just five pages long in a normal-sized font. Doc. No. 11-7, ex. F. Every paragraph begins with a heading in all caps and bold. The grant of security interest appears on the first of the five pages. On the second page appears the following:

> **Location of and Transactions Involving the Collateral.** All Collateral is located at Debtor's address shown above. <u>Debtor shall not remove the Collateral from its existing locations without the prior written consent of Bank</u>. Except for inventory sold or accounts collected in the ordinary course of Debtor's business, <u>Debtor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Debtor shall not pledge, mortgage, encumber or otherwise permit the Collateral</u> to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Bank. Unless waived by Bank, <u>all proceeds from any disposition of the Collateral shall be held in trust for Bank</u>, shall not be commingled with any other funds, and shall immediately be delivered to Bank. This requirement, however, does not constitute consent by Bank to any such disposition.

Doc. No. 11-7, ¶ 3.2 (underlining added).

Another provision also dictated that Mr. Kern could not dispose of collateral at will:

> **Assemble Collateral.** Bank may require Debtor to assemble the Collateral and make it available to Bank at a place to be designated by Bank. <u>Bank also shall have full power to enter upon the property of Debtor to take possession of and remove the Collateral</u>. If the Collateral contains other goods not covered by this Agreement at any time of repossession, Debtor agrees that Bank may take such other goods, provided that Bank makes reasonable efforts to return them to Debtor after repossession.

> **Sell the Collateral.** <u>Bank shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in its own name or in the name of Debtor. Bank may sell the Collateral at public auction or private sale</u>. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Bank may give Debtor five (5) business days' prior notice of the time after which any private sale or any other intended disposition of the Collateral is to be made, which Debtor agrees is commercially reasonable. All

expenses relating to the disposition of the Collateral, including, without limitation, the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness and secured hereby.

*Id.*, ¶¶ 5.1, 5.2 (underlining added).

The court notes that nowhere does Mr. Kern deny reading this document; only that he did not understand it.

The February 2018 payment due on the 701K loan of $71,594 was made up of $28,040 in principal and $43,554 in interest. Doc. No. 11-10, ex. I, p. 2. The 1.399K Loan's payment of $142,882 was made up of $55,960 principal and $86,922 in interest. *Id.*, p. 3. The 500K Loan payment of $53,600 was made up of $20,000 principal and $33,600 interest. *Id.*, p. 4. The $430K loan payment of $460,880 consisted of $430,000 in principal and $30,880 in interest. *Id.*, p. 5. The bills were stated to be "informational only," as all payments were to be deducted from the Parke Account. *Id.*, pp. 2-5.

Regarding Mr. Kern's farming experience, he testified at his 2004 examination that he graduated from high school in 1989. Doc. No. 11-14, p. 14. His father began scaling back the farm when Mr. Kern was in his first year of college. *Id.*, p. 13. Mr. Kern earned a degree from LaSalle University in "management, organizational behavior." *Id.*, pp. 13-14. As a result of his father's scaling back the farm, when Mr. Kern took over in 1994, "it was almost gone and then [he] restarted again. . . . Had to start it from scratch." *Id.*, p. 14. Mr. Kern took out loans, which he described as "commonplace for farming." *Id.*, p. 15. "It's all out. You know, you had a basic credit line to buy your seed, fertilizer, chemicals. It's all inputs going out and you have to swing for the fence. There's no halfway of doing something. And unfortunately, you're at the mercy of what you're going to get paid. So that's just the way a typical farm operation works. It's all your income comes in later, but all your costs go out first." *Id.*, pp. 15-16.

### B. Mr. Kern's Certification

In addition to responding to Parke's allegations, Mr. Kern submitted a certification in opposition to the motion. Doc. No. 14-1. There Mr. Kern denied obtaining the loan by fraud. *Id.*, ¶ 31. He averred that he "would not characterize myself as a sophisticated or knowledgeable businessman. That would be especially so in the area of financing." *Id.*, ¶ 16. He continued:

17. I did not act with any deliberate intent to injure Parke Bank when I sold farm machines that I owned to raise money to be able to make my 2018 payments that were due to Parke Bank.

18. I did not understand the nature of what I was signing other than I knew that I had an obligation to repay Parke Bank in accordance with the terms of the four notes.

19. I did not understand the significance of the security agreements.

20. It was my belief that I could make the sales of the farm machinery to CJE (the John Deere transaction) and to CC Heavy Equipment (the Blue Bridge transaction and the FPL transaction) as long as I made the payments to Parke Bank.

*Id.*, ¶¶ 17-20.

Regarding the GFRS transaction, Mr. Kern stated that he only gave GFRS additional collateral for the lease it granted him. *Id.*, ¶ 23. He "did not believe that [he] was violating any of Parke's rights." *Id.*

Mr. Kern also states that

No one explained to me at the time of the making of the loan, or at any time through the date of the filing of the bankruptcy petition that I could not sell any of my property or encumber any of my property with a lien without asking for Parke's permission. Furthermore, when I sold the farm machinery, none of the companies involved namely CJE, John Deere, CC Heavy Equipment, Blue Bridge, FPL and GFRS, indicated to me that I could not sell or encumber the items sold because of any prior liens. These were all large companies and they did not indicate any impediments to transfer.

*Id.*, ¶ 24.

## DISCUSSION

### A. Summary judgment standard

A court may grant summary judgment under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* At the summary judgment stage, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial." *Knauss v. Dwek*, 289 F.Supp.2d 546, 549 (D.N.J. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The court must construe facts and inferences in a light most favorable to the non-moving party. *See Am. Marine Rail NJ, LLC v. City of Bayonne*, 289 F.Supp.2d 569, 578 (D.N.J. 2003) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986)). "Only evidence admissible at trial may be used to test a summary judgment motion. Thus, evidence whose foundation is deficient must be excluded from consideration." *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 471 (3d Cir.1989) (citations omitted).

The moving party must make an initial showing that there is no genuine issue of material fact. *See Knauss*, 289 F.Supp.2d at 549 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then shifts to the non-moving party to "'make a showing sufficient to establish the

existence of [every] element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Cardenas v. Massey*, 269 F.3d 251, 254–55 (3d Cir. 2001) (questioned on other grounds) (quoting *Celotex Corp.*, 477 U.S. at 322). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). Furthermore, a material fact is determined by the substantive law at issue. *See Crane v. Yurick*, 287 F.Supp.2d 553, 556 (D.N.J. 2003) (citing *Anderson*, 477 U.S. at 248). A fact is "material" if it might affect the outcome of the suit under governing law. *Id.* Disputes over irrelevant or unnecessary facts are insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 248 (citation omitted). Once the movant carries its burden, if the non-moving party fails to properly address the movant's factual assertion, the court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

"However, before a court can conclude a genuine issue of fact exists, it must assess whether the evidence presented by the party opposing summary judgment has actually contradicted the movant's evidence." *Vanguard Telecommunications, Inc. v. S. New England Tel. Co.*, 722 F. Supp. 1166, 1185 (D.N.J. 1989), *aff'd,* 900 F.2d 645 (3d Cir. 1990) (citing *First Natl. Bank of Pa. v. Lincoln Nat. Life Ins.,* 824 F.2d 277, 280 (3d Cir. 1987)). Some of Mr. Kern's denials are contradicted by his deposition testimony. In that situation, courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (citing, *inter alia*, *Hackman v. Valley Fair*, 932 F.2d 239 (3d Cir. 1991)). The court in *In re Howe*, 446 B.R. 170 (Bankr. E.D. Pa. 2009) (J. Raslavich), explained:

> Indeed, the Supreme Court has recogniz[ed] "virtual unanimity" in the Circuit Courts of Appeals that a party cannot survive summary judgment simply by contradicting his or her own previous sworn statement by filing later an affidavit that flatly contradicts that party's earlier sworn deposition. *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806–807, 119 S. Ct. 1597, 1603–1604, 143 L.Ed.2d 966 (1999) This is sometimes referred to as the "sham affidavit" rule. *See Jiminez v. All American Rathskeller, Inc.,* 503 F.3d 247, 251 (3d Cir. 2007). A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. *Id.* at 253. The Third Circuit has understood that the rule has been seen by some as impermissibly determining credibility or weighing evidence. *Id.* That such a view is unsupported is reflected by the Supreme Court's explanation that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine *whether there is a genuine issue for trial." Liberty Lobby, supra,* 477 U.S. at 249, 106 S. Ct. at 2511 (emphasis added). Thus, a crucial distinction is observed between weighing competing evidence and determining whether one party has even offered *any* evidence (i.e., a genuine fact, scintilla of evidence) [that] might necessitate a trial. It is the "genuineness" of the opponent's evidence [that] determines whether it is a sham.

*Id.*, 175-76. In *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747 (D.N.J. 1995), this principle led to the court disregarding an affidavit and finding that the inconsistency did not constitute a genuine issue of material fact. *Id.*, 788. *See Martin v. Merrell Dow Pharm., Inc.*, 851 F.2d 703 (3d Cir. 1988):

> "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."

*Id.*, 706 (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). *See also In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) ("A denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it; and if so, there is no occasion to submit the issue of knowledge to determination at a trial. … 'Factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.'") (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)); *In re Dygert*, 98-45925, 2000 WL 630833, at *10 (Bankr. D. Minn. May 11, 2000) ("Dygert's deposition testimony is controlling over his later, conflicting affidavit.").

As will be explained, below, both actual fraud and fraudulent transfer require proof of intent to defraud. When intent is an element, courts agree that summary judgment is "ordinarily inappropriate." *Vanguard Telecommunications, Inc. v. S. New England Tel. Co.*, 722 F. Supp. 1166, 1185 (D.N.J. 1989), *aff'd,* 900 F.2d 645 (3d Cir. 1990). *See Matter of 560 Ocean Club, L.P.*, 133 B.R. 310, 325 (Bankr. D.N.J. 1991) ("As a general proposition, questions involving intent, malice, conspiracy and the like should not be resolved by summary judgment.") (citing *Robertson v. Seidman & Seidman,* 609 F.2d 583, 591 (2nd Cir. 1979)).

Some, however, find an exception when the record allows.

Notwithstanding the general principle stated above, in some cases, the issue of intent may be determined at the summary judgment stage. A court may infer an intent to hinder or delay creditors "where the debtor has committed some act of deception ... that would justify a finding that the debtor improperly intended to forestall creditors from realizing on their claims."[13] In this regard, "[w]hen the evidence is *so one sided that reasonable minds could not differ as to the only rational outcome* ... the factual issue of intent can be decided by the court as a matter of law." *Okan's Foods,* 217 B.R. [739], 755 [Bankr. E.D. Pa. 1998) (J. Raslavich) (emphasis added); *accord In re Dygert,* 2000 WL 630833, at *9 (Bankr. D. Minn. May 11, 2000). Indeed, *Weidner I,* a case involving actual intent to hinder, delay or defraud a creditor, was decided on summary judgment.

FN13: *In re Williams,* 2011 WL 883922, at *5 (Bankr. N.D. Ill. Mar. 11, 2011) (quoting *In re Bronk,* 444 B.R. 902, 915 n. 15 (Bankr.

> W.D. Wis. 2011)) (internal quotations omitted); *accord In re Smiley,*
> 864 F.2d 562, 568 (7th Cir. 1989) (by misrepresenting value of his
> assets and fact that they were encumbered, court inferred that debtor
> had intent to hinder and/or delay his creditors, even though he had
> no intent to defraud them).

*In re Weidner*, 476 B.R. 873, 883 (Bankr. E.D. Pa. 2012) (J. Frank).

In *Okan*, 217 B.R. 739, the court applied this principle in finding that the debtor intended to omit disclosing a potential claim in proposing a plan paying unsecured creditors only 15% of their allowed claims, then filing the claim alleging in excess of $750,000 in damages after confirmation, when the claim had revested in the debtor. *Id.*, 755. In *Dygert*, 2000 WL 630833, the court found that the debtor, an attorney, defrauded investors in a company he knew was on shaky ground by not fully providing information about the company's liabilities. It cited the debtor's intimate knowledge of the financial condition of the company, understanding that information about liabilities generally would be important in evaluating the financial stability of a business, and knowledge that there were substantial losses for the company at the same time he was claiming increasing profits. The court also noted that the debtor's affidavit at no time explicitly denied an intent to deceive the plaintiffs.

## B. Nondischargeability pursuant to 523(a)(2)(A)

The court understands Parke's argument here as claiming that its debt for the money obtained on the extended line of credit, for forbearing from calling the loan, and incurred in connection with Mr. Kern's sale and leaseback of collateral and granting of a security interest to GRBS on collateral already secured by Parke, should be nondischargeable due to actual fraud and/or as fraudulent conveyances.

Section 523(a)(2)(A) provides that an individual is not discharged under section 1228(a) from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A). "[A]n extension [for purposes of section 523(a)(2)] may be an 'increase in length of time' or 'an agreement on or concession of additional time (as for meeting an overdue debt or fulfilling a legal formality).'" *Field v. Mans*, 157 F.3d 35, 43–44 (1st Cir. 1998) (quoting *Webster's Third New International Dictionary* 804–05 (1971)). *See In re Hay Phat*, 623 B.R. 371, 377–79 (Bankr. E.D. Pa. 2021) (describing reasoning of courts deciding whether forbearance constitutes an extension of credit under section 523(a)(2)(A), and finding the majority view, that does include it, as more persuasive). Here, Parke actually gave new money on the line of credit and forbore from calling the loan for another year. Because the phrase "to the extent obtained by" in § 523(a)(2)(A) modifies "money, property, services, or . . . credit," not "any debt," the debt sought to be excepted from discharge must result from the fraudulent transfer, though "the time of incurring such debt is not limited to the inception of a transaction." *In re Wisner*, 608 B.R. 589, 597 (Bankr. N.D. Ga. 2019), citing *Cohen v. De La Cruz*, 523 U.S. 213, 213–14 (1998).

The elements that must be proven for actual fraud under section 523(a)(2) are:

(1) the debtor obtained money, property or services through a material misrepresentation;
(2) the debtor, at the time, knew the representation was false or made with gross recklessness as to its truth;
(3) the debtor intended to deceive the creditor;
(4) the creditor [justifiably] relied on the debtor's false representations; and
(5) the creditor sustained a loss and damages as a proximate result of the debtor's materially false representations.

*In re Karpo*, 2011 WL 3034486, at *6 (Bankr. D.N.J. July 22, 2001) (citing *De La Cruz v. Cohen (In re Cohen)*, 191 B.R. 599, 604 (D.N.J. 1996), *aff'd*, 106 F.3d 52 (3d Cir. 1997), *aff'd*, 523 U.S. 213 (1998) (internal citations omitted)). Gross recklessness satisfies the scienter requirement of section 523(a)(2)(A). *In re Bocchino*, 794 F.3d 376, 380 (3d Cir. 2015).

As for fraudulent transfer—the transfers of equipment subject to Parke's security interest— the Bankruptcy Code defines that as a transfer made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]" 11 U.S.C. § 548(a)(1)(A).

The Supreme Court in *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016), broadened the universe of fraud that can be nondischargeable under section 523(a)(2)(A) in holding that section 523(a)(2)(A) includes forms of fraud such as fraudulent conveyance schemes. *Id.*, 1586. It indicated that, although it "historically" had defined actual fraud as requiring the elements of common law fraud (the "actual fraud" elements recited above), it held that "anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'" *Id.*, 1586. The Court reasoned "from the beginning of English bankruptcy practice, courts and legislatures have used the term "fraud" to describe a debtor's transfer of assets that, like Ritz' scheme, impairs a creditor's ability to collect the debt." *Id.*, 1587. Thus, any fraud involving moral turpitude or intentional wrong that is done with wrongful intent is "actual fraud." *Id.*, 1586.

Regarding fraudulent conveyances, the Court further explained that

[F]raudulent conveyances, although a "fraud," do not require a misrepresentation from a debtor to a creditor. As a basic point, fraudulent conveyances are not an inducement-based fraud. Fraudulent conveyances typically involve "a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration." . . . In such cases, the fraudulent conduct is not in dishonestly inducing a creditor to extend a debt. It is in the acts of concealment and hindrance. In the fraudulent-conveyance context, therefore, the opportunities for a false representation from the debtor to the creditor are limited. The debtor may have the opportunity to put forward a false representation if the creditor inquires into the whereabouts of the debtor's assets, but that could hardly be considered a defining feature of this kind of fraud.

*Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. at 1587 (internal citations omitted). *See id.*, 1588 ("That principle also underscores the point that a false representation has never been a required element of 'actual fraud,' and we decline to adopt it as one today.").

A plaintiff may prove intent to deceive "by showing, by a totality of the circumstances, reckless indifference or reckless disregard of the accuracy of information." *In re Bocchino*, 794 F.3d 376, 382 (3d Cir. 2015). This can include silence regarding a material fact. *Id.*

"Because actual fraud is rarely proven by direct evidence, as individuals are rarely willing to admit such an intent, courts may infer actual intent by examining the circumstances and considering whether various 'badges of fraud' are present." *In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006). In New Jersey, the federal courts have looked to New Jersey's statutory badges of fraud to determine intent to defraud. *In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006) (citing N.J.S.A. § 25:2–26 and stating its factors are equally applicable to section 548 fraudulent transfers). Those factors are:

> a) The transfer or obligation was to an insider;
> b) The debtor retained possession or control of the property transferred after the transfer;
> c) The transfer or obligation was disclosed or concealed;
> d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> e) The transfer was of substantially all the debtor's assets;
> f) The debtor absconded;
> g) The debtor removed or concealed assets;
> h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
> h) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.J.S.A. 25:2–26. *In re Crivaro*, 15-23020 (JNP), 2017 WL 3314232, at *5 (Bankr. D.N.J. Apr. 24, 2017), *aff'd sub nom. United Supply Co. v. Crivaro*, 1:17-CV-3256 (NLH), 2018 WL 1605152 (D.N.J. Apr. 3, 2018) (same).

> A finding by a court that one badge of fraud is present may "cast suspicion on the transferor's intent," but a finding of "several in one transaction generally provides conclusive evidence of an actual intent to defraud." *Gilchinsky v. National Westminster Bank N.J.,* 159 N.J. 463, 732 A.2d 482, 489–90 (N.J.1999). "The proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *Id.*

*In re Glob. Outreach, S.A.*, CIV.A. 11-620 JLL, 2011 WL 2294168, at *5 (D.N.J. June 6, 2011).

Finally, the provisions of section 523(a) are "strictly construed against creditors and liberally construed in favor of debtors," owing to the overriding bankruptcy purpose of granting debtors a fresh start. *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995). Nondischargeability under section 523 must be established by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

Here, Parke argued:

> Here, Debtor transferred his interest in the Equipment with intent to hinder, delay, or defraud Parke. He secretively sold and/or transferred his equipment to third parties, including CEK Farms, and he converted the proceeds for his own use. Debtor's annual loan payments were a separate and distinct obligation. Parke should have received the loan payments and the Converted Proceeds. Debtor knew he could not maintain operations and also pay his loans to Parke as required, so he sold the Equipment to get the cash for his operations while tricking Parke into extending the Line of Credit and forbearing from collections for another year.

Doc. No. 11-1, pp. 31-32. *See In re Wisner*, 608 B.R. at 597 (noting that "section 523(a)(2) is only implicated when a plaintiff can prove that the debt in question was 'obtained by' the fraudulent conveyance scheme."). This sets forth a cause of action under section 523(a)(2)(A).

To this specific accusation, Mr. Kern answered that because there was no fraud at the inception of the loans, Parke cannot prevail under section 523(a)(2)(A). But Parke did not allege fraud in connection with execution of the original loans, only with the line of credit extension. In addition, it alleged that Mr. Kern fraudulently conveyed Parke's collateral in a manner that hindered, delayed or defrauded Parke with the "debt obtained" by Mr. Kern's actions being the damages that Parke alleges.

Later, in his certification in opposition to summary judgment, Mr. Kern denied intent to defraud, denied understanding the loan documents, asserted that he believed he could do anything with the equipment so long as he paid Parke, and complained that nobody, including the entities he sold equipment to, told him he could not do so.

However, Mr. Kern did not deny any of the transfers, that Parke would not have extended the line of credit if he had not made the February 2018 payments, or that he was able to make those payments because of the transfers.

Regarding intent to deceive (for actual fraud purposes) or to hinder, delay or defraud (for fraudulent transfer purposes), the undisputed and/or admissible-at-trial record shows that Mr. Kern is college-educated with an undergraduate degree in management. He has run this farm "from scratch" since 1994, something requiring annual financing. The Blanket Security Agreement clearly included a covenant that Mr. Kern could not dispose of Parke's collateral without Parke's consent. Parke's lien covered all of Mr. Kern's then-existing equipment except for two enumerated exceptions supporting an inference that Mr. Kern had to be aware that Parke's lien attached to everything else. Mr. Kern received the funds from CJE and negotiated the Blue Bridge Transaction during the weeks prior to the Loan Meeting but made no mention of the sales to any of the Parke

representatives present at the meeting. At the March 2018 Loan Meeting, Mr. Kern either told Parke he was expecting to come into some money for work he had done when in fact, he was expecting the funds from the Blue Bridge Transaction, or he omitted that he had sold Parke's collateral to obtain the funds. Mr. Kern either told Mr. Talarico that the Deere Planter was missing because it had been sold prior to Parke's loan, or kept secret that he had sold it to CJE six weeks prior. When Parke representatives were at the farm in 2019, Mr. Kern made no mention that any of the equipment being examined was liened by other creditors. During that 2019 inspection, when Mr. Kern led the Parke representatives to CJE to view the CJE Equipment, he told Mr. Talarico that the CJE Equipment was there for repairs, when it had actually been repossessed a few weeks prior, which in turn concealed the fact that he had sold the CJE Equipment to CJE and leased it back to CEK Farms. Mr. Kern took the "Converted Funds" and deposited them first in his accounts at Century Savings Bank before transferring them to his account at Parke to make his payments, which concealed the source of funds. *Compare In re Ramonat*, 82 B.R. 714, 721–22 (Bankr. E.D. Pa. 1988) (holding debt nondischargeable in part after noting that debtors were educated individuals, were not neophytes in the business world, and worked with the business through several years of financial difficulty), *with In re Glenn*, 470 B.R. 731, 736–37 (Bankr. M.D. Pa. 2012) (denying summary judgment due to genuine issue of material fact whether the debtors thought they had a right to remove fixtures from property prior to quitting premises).

In reviewing the badges of fraud, some transfers were from Mr. Kern to CEK Farms, LLC, an insider. Mr. Kern retained possession and control of the property after the transfers. He failed to disclose and/or concealed the transfers from Parke. The value of the consideration was reasonably equivalent to the value of the equipment transferred. Some of the transfers occurred just before his annual loan payments were due.

While the court is not to weigh evidence on a summary judgment motion, it is tasked with determining whether there is a genuine issue of material fact requiring trial. Since here the bankruptcy court, itself, is the trier of fact, the question is whether Mr. Kern's flat denial of intent to defraud raises a genuine issue. Mr. Kern's experience in financing the farm operations over 25 years, the loan documents clearly setting forth his responsibilities regarding the collateral, the fact that Parke sent out personnel to check on the equipment (why would they do that if Mr. Kern had unfettered control of the collateral?), his recourse to selling equipment rather than negotiate with Parke, and his direct lying or lying by omission, support that he intended to hinder, defraud and delay Parke. The court does not need to assess Mr. Kern's demeanor at trial: the undisputed facts and badges of fraud overcome any denial of Mr. Kern's intent.

As Mr. Kern has not set forth a genuine issue of material fact precluding judgment as a matter of law, the court finds that the debtor committed actual fraud and fraudulent transfers such that the resulting debt will be deemed nondischargeable.

## C. Nondischargeability for willful and malicious injury pursuant to 523(a)(6)

Section 523(a)(6) provides that a discharge "does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "The debtors who commit fraudulent conveyances *and* the debtors who make false representations under § 523(a)(2)(A) could likewise also inflict "willful and malicious injury" under § 523(a)(6). There is, in short, overlap, but that overlap appears inevitable." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. at 1588.

> An injury is "willful and malicious" within the meaning of Section 523 "when the actor purposefully inflicts injury or acts in such a manner that he is substantially certain that injury will result." *In re Hawkins*, 231 B.R. 222, 228 (D.N.J. 1999) (citation omitted). Mere reckless or negligent conduct does not fall within the scope of Section 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 63-64 (1998).

*In re Wulster*, No. ADV 09-2015 MBK, 2012 WL 589564, at \*3 (D.N.J. Feb. 22, 2012). *In re Conte*, 33 F.3d 303, 309 (3d Cir. 1994) ("[T]he Bankruptcy Code requires at least a deliberate action that is substantially certain to produce harm.").

> As for malice, courts apply an objective, "implied malice" approach. *In re Pearman,* 432 B.R. at 501. Under this approach, the inquiry is whether "the debtor caused harm through a deliberate action with an objective substantial certainty of injury." *Id.* (citing *In re Peterson*, 332 B.R. 678, 682–83 (Bankr. D. Del. 2005)).

*In re Aaroe*, 11-12201 RTL, 2011 WL 2886312, at \*8 (Bankr. D.N.J. July 14, 2011). *See In re Meyers*, 1:09-BK-09310MDF, 2010 WL 5475650, at \*6 (Bankr. M.D. Pa. Dec. 29, 2010) (denying motion to dismiss where creditor alleged that the debtor "committed a voluntary, wrongful act that he knew was wrongful and which he did with substantial certainty that injury would result.").

> "Malice" is distinct from willfulness. The commonly-accepted definition of malice encompasses an injury that is "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *In re Jacobs*, 381 B.R. 128, 138–39 (Bankr. E.D. Pa. 2008); 4 *Collier on Bankruptcy* ¶ 523.12[2] (Alan N. Resnick and Henry J. Sommer eds., 16th ed. 2013). A plaintiff is not required to prove that the debtor acted with "specific malice." *Conte*, 33 F.3d at 308 (quoting *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1009 (4th Cir. 1985)). In a § 523(a)(6) proceeding, a debtor may act with malice without bearing any subjective ill will toward the Hospital/creditor or any specific intent to injure the same. *In re Wooten*, 423 B.R. 108, 130 (Bankr. E.D. Va. 2010); *In re Davis*, 262 B.R. 663, 670–71 (Bankr. E.D. Va. 2001).

*In re Rezykowski*, 493 B.R. 713, 722 (Bankr. E.D. Pa. 2013). *See In re Dietrich*, 595 B.R. 59, 65–66 (Bankr. E.D. Pa. 2018) (J. Fehling) (agreeing with the *Rezykowski* analysis).

> [M]alicious intent must be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in

violation of those rights. . . . Such knowledge can be inferred from the debtor's experience in the business, his concealment of the sale, or by his admission that he has read and understood the security agreement. . . . Other courts have found that the conduct must be targeted at the creditor ("malicious"), at least in the sense that the conduct is certain or almost certain to cause financial harm.

*In re Padgett*, 105 B.R. 665, 667–68 (Bankr. E.D. Okla. 1989) (internal citations omitted).[7]

Parke bases its 523(a)(6) count on Mr. Kern's conversion of Parke's collateral. Conversion can apply to the wrongful use of money. *First Am. Title Insurance Co. v. Sadek*, CV111302KMMAH, 2017 WL 6663899, at *5 (D.N.J. Dec. 29, 2017). This court has previously considered conversion as the basis for nondischargeability under section 523(a)(6):

A plaintiff alleging conversion as the basis for nondischargeability under section 523(a)(6) must first establish that conversion has occurred under New Jersey law, and then that the conversion was willful and malicious. *Pfeiffer,* 2011 WL 1045355, at *5. New Jersey law provides for conversion as follows:

Conversion is the intentional exercise of dominion or control over personal property that seriously interferes with the right of another to control it. *See Mueller v. Tech. Devices Corp.,* 8 N.J. 201, 207 (1951); *see also Commercial Ins. Co. v. Apgar,* 111 N.J. Super. 108, 114, 267 A.2d 559 (Law Div. 1970); Restatement (Second) of Torts § 222A(1) (2007). "The essence of a conversion claim is that one party exercises the right of ownership over property belonging to another without that person's permission." *Boccone v. Levinson,* No. 04–3871, 2006 U.S. Dist. LEXIS 94475, *19–20 (D.N.J. Dec. 26, 2006). To prove a claim for conversion, a plaintiff must prove "(1) that the alleged offender assumed and exercised the right of ownership over the party's goods or chattels without permission, and (2) excluded the owner from exercising dominion over them." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 275 F.Supp.2d 543, 576 (D.N.J.) *aff'd,* 342 F.3d 191 (3d Cir.2003) (citing *Barco Auto Leasing Corp. v. Holt,* 228 N.J. Super. 77, 83 (App. Div. 1988)); *Woodside v. Adams,* 40 N.J.L. 417 (Sup. Ct. 1878).

*Pollen v. Comer,* No. CIV.05 1656 JBS, 2007 WL 1876489, at *11 (D.N.J. June 27, 2007) (emphasis added).

*In re DeCastro*, 14-15597-ABA, 2015 WL 9777729, at *9–10 (Bankr. D.N.J. Nov. 25, 2015).

---

[7] *See In re Breedlove*, 2007 WL 2034143, at *20 (stating that *Padgett* relied on a definition of willful (not malicious) that was overruled by *Geiger*).

Regarding willful and malicious injury, this court stated that "conversion is not *per se* willful and malicious for purposes of section 523(a)(6). . . . A conversion may be "'innocent or technical, an unauthorized assumption of dominion without willfulness or malice.'" *Id.*, at \*10 (quoting *Danese,* 2013 WL 1163780, at \*2 (quoting *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332 (1934))). "The key for the court to a finding of conversion under section 523(a)(6) is whether something was taken without permission." *Id.* (holding that because the plaintiff knowingly and willingly loaned the funds to the debtor, he did not acquire the funds without her permission). *See In re Moschell,* 607 B.R. 487, 500 n.6 (Bankr. W.D. Pa. 2019) (willful and malicious injury under section 523(a)(6) includes a willful and malicious conversion); *In re Dietrich,* 595 B.R. 59, 65–66 (Bankr. E.D. Pa. 2018) (J. Fehling) (same); *In re Ramonat,* 82 B.R. at 721 (same).

"In determining whether an act of conversion is willful and malicious, consideration must be given to the circumstances of the conversion. The court must examine the debtor's state of mind at the time the debtor took the action that produced the injury." *First Am. Title Insurance Co. v. Sadek,* 2017 WL 6663899, at \*6 (D.N.J. Dec. 29, 2017). If there is an issue as to the defendant's knowledge and state of mind, then that presents an issue for trial, and summary judgment must be denied. *Id.*, at \*7.

Parke alleges that Mr. Kern converted the proceeds from the sales of equipment subject to Parke's security interest. Several courts have held a debtor's conversion of collateral resulted in a nondischargeable debt pursuant to section 523(a)(6). *See In re Rezykowski,* 493 B.R. 713 (debtor's sale of assets of her business without the prior written consent of the lienholder and taking the money for herself); *In re Wooten,* 423 B.R. 108 (Bankr. E.D. Va. 2010) (debtor converted credit card receivables by paying the proceeds to himself to pay the mortgage on his personal residence and his employees' salaries); *In re Padgett,* 105 B.R. 665 (Bankr. E.D. Okla. 1989) (debtor sold vehicles out of a floor plan); *Matter of Cullen,* 71 B.R. 274 (Bankr. W.D. Wis. 1987) (debtor sold cattle and did not turn over any of the proceeds to the bank).

In *Wooten,* the court rejected the debtor's contention that he did not read the security agreement, in part considering he had initialed every page, and cited the debtor's business experience and that at the time he took collateral the business had ceased but the debtor did not notify the lender. The court in *Padgett,* inferred that the debtor acted maliciously by considering the debtor's business experience, concealment of sale, and admission that he read and understood the security agreement, and rejected the debtor's justification that he sold the vehicles to keep the business afloat pending additional financing since the debtor did not notify the creditor as required. The *Cullen* court considered that the debtor did not turn over any of the proceeds to the bank, and cited the debtor's business experience, including with security agreements, and the fact that bank representatives told him he had to turn over proceeds from cattle sales.

Courts ruling for debtors found that the debtor misused the proceeds in a desperate measure to keep the business running and used a substantial portion of the proceeds to pay the lienholder, and believed that the debtor did not understand the security agreement, *In re Bittar,* ADV 10-2589, 2012 WL 1605160 (Bankr. D.N.J. May 8, 2012); agreed there was a genuine issue of material fact whether the debtors thought they had a right to remove fixtures from property prior to quitting premises, *In re Glenn,* 470 B.R. 731 (Bankr. M.D. Pa. 2012); or considered that the debtor intended to pay the bank for the out-of-trust vehicles he sold and, once it became apparent that his business

could not continue, did not sell or otherwise compromise the bank's collateral. *Commercial Bank v. Breedlove (In re Breedlove),* Adv. No. 04–1116, 2007 WL 2034143 (Bankr. N.D. Okla. July 9, 2007).

Here, Parke alleged that Mr. Kern committed a willful and malicious injury by converting the equipment that he sold and leased back.  Parke argued that Mr. Kern acted with willfulness and malice when he converted the proceeds and the equipment. It cited that the Blanket Security Agreement prohibited him from selling Parke's collateral without its consent; the presence of the two excluded items from the list of equipment collateral shows that he had to be aware he was granting Parke a lien on everything else; he intentionally concealed that he sold off equipment to make his first loan payments; he misrepresented to Mr. Talarico that the Deere Planter had been sold prior to the Parke loan closing; and he represented to Parke in June 2019 that the CJE equipment was in for repairs, omitting that CJE had repossessed it. In addition, Parke argued that after Mr. Kern sold the equipment, Parke's lien attached to the Converted Proceeds, which Mr. Kern then shuffled across three bank accounts. Though he made his annual payments, he paid other expenses as well as himself. At some point, he either transferred ownership of the GFRS Equipment to CEK so that CEK could offer the GFRS Equipment to GFRS as additional collateral (a fraudulent transfer) or he pledged the GFRS Equipment to GFRS and misrepresented that it belonged to CEK. He then made a false representation to this court in a certification that he had never disposed of any of Parke's collateral.

Mr. Kern replied that Parke settled with three of the four entities to whom Mr. Kern sold equipment subject to Parke's collateral, receiving money "or at least return of the collateral." Doc. No. 14, p. 16. He points out that Blue Bridge is contesting Parke's lien in state court, alleging that Parke's UCC-1 was "vague and ambiguous and therefore insufficient." *Id.* He argued that Blue Bridge allegedly further argued that Parke's receipt of the proceeds of CC Heavy Equipment's purchase of the equipment extinguished Parke's security interest. *Id.*, p. 17.[8]

More relevant, Mr. Kern denied that he acted with any deliberate intent to injure Parke, stating that he sold the equipment to raise money to be able to make his 2018 annual payments. He asserted that he did not understand the agreements he signed other than that he had to pay Parke back in accordance with the terms of the four notes. He stated that he did not understand the significance of the security agreements. He thought that he could sell the equipment so long as he made the payments to Parke.

The court finds, first, that Parke received money or return of the collateral is no defense to whether Mr. Kern's actions were willful and malicious, only as to whether or to what extent Parke was injured by those actions. In its damages assessment, Parke subtracted out any monies it received from the other lienholders from its damages. In addition, whether Parke's security interest was superior to Blue Bridge's does not negate the interest vis-à-vis Mr. Kern or the contractual requirement to obtain Parke's consent prior to selling any collateral.

---

[8] This argument is not a defense to the nondischargeability action except to the extent it might affect damages. However, on July 19, 2021, Parke filed a supplement to its Motion for Partial Summary Judgment attaching an order and opinion of the New Jersey Superior Court finding that Parke's lien is senior to that of Blue Bridge. *See* Doc. No. 22.

Though Mr. Kern denied converting the collateral, he clearly interfered with Parke's interest in and right to control the equipment by selling the equipment without Parke's permission. *See In re Blanchard*, 201 B.R. 108, 117–18 (Bankr. E.D. Pa. 1996) (finding that "[t]here is no question in this case that the Plaintiffs have been prevented from maintaining their rights in the furniture and equipment of the Centers which was sold by the Debtors."). The Blanket Security Agreement clearly set forth the prohibitions on transfer of the collateral, thus Mr. Kern had knowledge of Parke's rights and yet took action in violation of those rights. The court rejects Mr. Kern's contention that somebody else—the entities he transferred equipment to—was responsible for informing him that he could not do what he was doing. Thus, there is no genuine issue of material fact whether Mr. Kern converted the equipment.

Mr. Kern's denials as to willful and malicious intent are belied by the admissible evidence. First, his actions had a substantial certainty to cause injury. By reducing the amount of Parke's collateral—the annual premium payments included interest, thus the payments did not reduce the principal by the same amount as the collateral sale—he injured Parke. This does not require an understanding of the loan document's prohibition on sale of collateral without consent; it is just basic amortization. "A debtor's mere unsupported assertions of honest intent will not overcome the natural inferences from admitted facts. . . . Moreover, where the debtor is an individual of intelligence and experience in financial matters, courts have been more inclined to hold him responsible for publishing a false financial statement." *In re Dygert*, 2000 WL 630833, at *9 (internal citation omitted).

But as to whether he understood his obligations under the loan documents, at trial this court would consider Mr. Kern's demeanor against the admitted facts of his business experience. Beginning in January of 1994, he "started borrowing all the money and paying the bills" and continued doing that since then. Doc. No. 11-4, ex. M (2004 exam), p. 5 of 44. His college degree was in management. *Id.* Because his father had scaled the farm back in anticipation of retiring, Mr. Kern started the farm "from scratch." *Id.* He routinely borrowed money on a credit line for his upfront costs. *Id.* He had to have understood that using collateral proceeds to make annual payments was not a one-for-one transaction. His actions were substantially certain to injure Parke by reducing its collateral position and inducing it to extend more credit, Mr. Kern's goal.

Admittedly, where similar conversions were held nondischargeable under section 523(a)(6), the debtors did not pay over any of the sale proceeds to their lienholders, whereas here, Mr. Kern paid over some, suggesting that the conversion was done to help keep the business afloat. But nowhere does Mr. Kern assert this. Moreover, this result in *Bittar* is not persuasive, as the court there found that paying over $6,000 of the $13,000 received constituted a "substantial portion of the proceeds," calling that action "the single strongest piece of evidence regarding Mr. Bittar's intent." But paying over less than half of the proceeds is not a "substantial portion," and in any case, Mr. Kern should have made the annual payment *plus* pay over the sale proceeds.

Though Parke never lost its lien priority, Parke has also showed that it was damaged by the delay in liquidating the equipment pursuant to Mr. Kern's chapter 12 plan. Had Parke known in 2018 that Mr. Kern could not pay the annual payments on the loans except by selling Parke's collateral to do so, it asserts that it would have called the loan. That it did so the following year when Mr. Kern could not pay, supports this allegation.

Accordingly, the court also finds that Parke's debt is nondischargeable as arising from a willful and malicious injury that occurred after the original loan.

### D. Damages

As recited above, Parke alleges that its damages flowing from Mr. Kern's conduct as of May 31, 2021 totals anywhere from $270,393 to $473,643, plus counsel fees and legal costs continuing to accrue and litigation ongoing, as follows.

    a. $54,000 or more in legal fees and costs.
    b. $69,000 extended on the line of credit.
    c. $147,393 – $350,643 for the converted equipment.
    d. Any amounts paid to other secured creditors in settlement.

Mr. Kern argued that "§ 523(a)(2)(A) indicates that a debt is not discharged for money to the extent obtained by actual fraud. As set forth above, the creditor has the burden of establishing the Debtor's fraudulent intent at the inception of the debt. There are no facts which would support the finding of any fraudulent intent by Charles Eric Kern when the loan was made (at the inception of the debt)." Doc. No. 14, p. 7. However, this misunderstands Parke's argument: it did not allege that Mr. Kern committed fraud when he entered into the loans, it argued that he committed fraud in 2018 when he fraudulently converted Parke's collateral. As explained above, the Supreme Court in *Husky* held that debt arising from fraudulent transfers can be nondischargeable under section 523(a)(2)(A). This fraud, that created the illusion that Mr. Kern was able to make his annual loan payments, caused Parke injury by inducing it to extend the line of credit and not call the loans. Had Parke called the loan in 2018, it argues, the collateral would have returned a greater amount upon sale. Mr. Kern admitted as much when he stated "Parke extended additional monies because the Debtor paid his 2018 obligation on account of the four loans." Doc. No. 14-2, ¶ 177.

Mr. Kern responded to the damages calculation as "confusing at best and has items that are disputed." Doc. No. 14-2, ¶ 188. However, the court finds it quite straight-forward. There is no dispute as to the amount extended on the line of credit. *See* Doc. Nos. 11- and 14-2, ¶ 40. As for the converted equipment, the court believes that the proper measure of damages is the difference between what Parke could have sold the equipment for in 2018. For all of the equipment sold by Mr. Kern, there can be no dispute as to the value. Regarding the GFRS transaction, where CEK granted a lien on equipment as additional collateral, Parke estimated a 2018 value based on the appraised values of this equipment, admitted to by Mr. Kern, obtained in 2016, 2019 and 2020. Mr. Kern only boldly denied Parke's depreciated value without suggesting a different value. This created an issue of fact, but not a genuine issue. *See Vanguard Telecommunications, Inc. v. S. New England Tel. Co.*, 722 F. Supp. 1166, 1185 (D.N.J. 1989) (evidence presented by the party opposing summary judgment must actually contradicted the movant's evidence).

Regarding the legal fees and costs, in *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015), the Supreme Court noted that "[o]ur basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." The American Rule applies to fee-shifting in federal courts. *Choi v. ABF Freight Sys., Inc.*, 14–7458, 2015 WL

8758846, at *2 (D.N.J. Dec. 14, 2015) ("Our legal system generally adheres to the 'American Rule,' under which each party bears its own litigation expenses, including attorneys' fees, regardless of whether it wins or loses. *See Fox v. Vice*, 131 S. Ct. 2205, 2213 (2011). Departure from the 'American Rule' is only appropriate when there is express authorization in a statute, court rule, or contract. *Fin. Cas. & Sur., Inc. v. Bonino*, No. 11–4316, 2015 WL 3754549, at *2 (D.N.J. June 16, 2015)."). Parke has not pointed to a provision in the loan documents providing for attorneys' fees and costs for the collection of the amounts due.

Accordingly, the court holds that $216,393 ($147,393 and $69,000) will be held nondischargeable. In addition, if Parke is able to show an entitlement to attorneys' fees and costs, then that plus any amounts paid to other secured creditors in settlement will be nondischargeable.

### E. Mr. Kern's motion for partial summary judgment

Mr. Kern's summary judgment motion seeks entry of an order finding that three of his loans with Parke have been paid in full; directing Parke to give credit on the $500,000 loan in the amount of $181,972 that it received from the sale of collateral, from any sums already received or in the future received from CJE Equipment and/or John Deere, FPL, GFRS, and Blue Bridge. Doc. No. 18-3. However, this relief is beyond the scope of Parke's Amended Complaint, which only alleges nondischargeability.

If Mr. Kern believed that his request for declaratory and injunctive actions "arise out of the transaction or occurrence that is the subject matter of" Parke's claims, then he had to have asserted them as counterclaims against Parke in his answer.[9] Fed. R. Civ. P. 13(a)(a), incorporated into adversary proceedings by Fed. R. Bankr. P. 7013. *See Hacienda Records, LP v. Ramos*, 2:14-CV-19, 2016 WL 51235, at *2 (S.D. Tex. Jan. 5, 2016) (court did not err in not considering accounting claim raised only in response to a motion for summary judgment as not properly before the court); *N. Plainfield Bd. of Educ. v. Zurich Am. Ins. Co.*, CIV A 05-4398(MLC), 2009 WL 2413635, at *3 n.2 (D.N.J. Aug. 5, 2009) (denying defendant's motion for partial summary judgment as procedurally improper because court had already granted summary judgment in favor of the plaintiff, and defendant had not asserted any counterclaims against the plaintiff). Since he did not, the only summary judgment Mr. Kern could request in this adversary proceeding would be for summary judgment in his favor on Parke's counts. If Mr. Kern's request does not arise out of Parke's claims, then Mr. Kern has to file his own complaint against Parke.

Moreover, Parke states in its response that its application of funds in its system is unrelated to its judgments, on which its claim is based and which Parke has amended as funds were received. Doc. No. 20. Parke points out that Mr. Kern has not objected to Parke's amended claim. Again, this is something that Mr. Kern would have to do separately from this nondischargeability adversary proceeding.

Accordingly, the Motion for Partial Summary Judgment must be denied.

---

[9] Mr. Kern referred to attached transaction histories that show that some of the loans have been paid in full from the proceeds of the sale of the farm and questions whether Parke properly applied funds received from CJE, FPL and GRFS, but that was in his certification in opposition to Parke's summary judgment motion. Doc. No. 14-1, ¶¶ 34-39.

## CONCLUSION

Mr. Kern has not met his burden to show that there are genuine issues of material fact requiring a trial to determine his intent. Parke has set forth undisputed facts and law showing that it is entitled to judgment as a matter of law. It does not appear to me that a trial would change this result.

Accordingly, Parke's Motion for Summary Judgment is granted. The court finds that $216,393 of Parke's claim is nondischargeable. Parke shall, within 14 days, file a certification setting forth the basis on which it contends it is entitled to further legal fees or other expenses.

In addition, Parke shall advise the court within 28 days whether it intends to pursue its claim under Count II of the Amended Complaint else that Count will be dismissed with prejudice.

Mr. Kern's Motion for Partial Summary Judgment is denied without prejudice.

An appropriate judgment has been entered consistent with this decision.

/s/ Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: September 7, 2021